### UNITED STATES v. MARRIN et al.

(District Court, E. D. Pennsylvania. May 22, 1909.)

Nos. 44, 45, and 46.

1. BAIL (§ 74*)—IN CRIMINAL PROSECUTIONS—DISCHARGE OF SURETIES.

The arrest, trial, conviction, and imprisonment of a defendant who is at large on bail in a criminal case in a federal court by the courts of another state into which he voluntarily went with knowledge that prior indictments were there pending against him do not exonerate his bail from liability for his nonappearance.

[Ed. Note.—For other cases, see Bail, Cent. Dig. § 291; Dec. Dig. § 74.*].

2. BAIL (§ 84*)—IN CRIMINAL PROSECUTIONS—DISCHARGE OF SURETIES.

In such case it was not part of the duty of the district attorney of the United States to go into the foreign jurisdiction and institute or join in proceedings for the release or discharge of the prisoner from the custody of the state, and his failure to do so affords no defense to a proceeding to forfeit the defendant's bail.

[Ed. Note.—For other cases, see Bail, Dec. Dig. § 84.*]

3. BAIL (§ 79*)—IN CRIMINAL PROSECUTIONS—DISCHARGE OF SURETY.

A court will not exercise its discretion, where it is vested with such discretion, to refuse to forfeit a criminal recognizance to enable a creditor of the principal to recover a sum deposited by him with his surety as indemnity.

[Ed. Note.—For other cases, see Bail, Dec. Dig. § 79.*]

On Petition to Stay Forfeiture of Recognizance.
See, also, 159 Fed. 767.

J. Whitaker Thompson, for the United States.
John Creth Marsh, for defendant.
Edmund F. Harding and William P. Maloney, for Walter Westlake, administrator, etc.
Edward P. Bailey, for American Surety Co. of New York.

HOLLAND, District Judge. Frank C. Marrin presents his petition to this court praying that he be not held in default by reason of his nonappearance in person in court, and that his recognizance be not forfeited. On May 18, 1908, Marrin took an appeal from a sentence imposed upon him in this court to the appellate court of the Third circuit, and entered into a recognizance, with the United States Fidelity & Guaranty Company as surety, in the sum of $10,000, the condition of which is as follows:

"That if the said Frank C. Marrin, alias Frank C. Stone, alias Franklin Stone, alias Thomas Harper, whose application for a writ of error in the above matter has been allowed and is now pending, shall be and appear at the District Court of the United States for the Eastern district of Pennsyl-

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

vania, upon the determination of the proceedings on said writ of error, and the receipt and filing of a mandate or other process or certificate showing the disposition thereof by the said Court of Appeals, or within five days thereafter, to answer or obey any final order or judgment which shall be made in the premises, and not depart said court without leave thereof, then this recognizance to be void, otherwise to remain in full force and virtue."

On the 27th of February, 1909, the judgment of this court was affirmed. After the mandate had been returned the United States district attorney gave notice that he would require petitioner's appearance in court on the 12th day of April, 1909. Marrin failed to appear, but instead presented a petition asking that his recognizance be not forfeited, for the reason that upon the 18th day of September, 1908, whilst in the state of New York, he was arrested upon a warrant based upon old indictments filed in the Court of Quarter Sessions in Kings county, N. Y., in 1895, upon the charges of forgery and grand larceny, upon which indictments he was tried, convicted, and on the 21st day of October, 1908, sentenced to a term of imprisonment of 15 years at Sing Sing. It appears that shortly after his arrest in New York, on the 2d day of October, 1908, he obtained a writ of habeas corpus which was sued out of the United States District Court for the Eastern District of New York, claiming a right to be discharged because of his obligation to appear in the District Court here upon the determination of the pending appeal. The application for discharge was heard by Judge Chatfield, and it appears from the opinion of the court in Ex parte Marrin (D. C.) 164 Fed. 633, that the—

"American Surety Company appeared in court, by attorney, made no answer to the writ, and disavowed any interest in the matter except in the obligation imposed upon it by the bail bond furnished in the city of Philadelphia. The application was brought to the attention of the United States through the district attorney of the United States for the Eastern district of New York, the United States was represented in court by an assistant United States attorney for this district, and the statement was entered upon the record that the United States had no motion to make, did not apply for the custody of the said Frank C. Marrin, and cared neither to join in nor oppose the present application."

It is strenuously urged by the petitioner and his surety that the United States should not be permitted to forfeit his bond under the circumstances. There further appears in opposition to the forfeiture one Walter Westlake, administrator of Caroline Barry, deceased, who claims a fund of $10,000 placed in the possession of the American Surety Company as a counter indemnity by Marrin when the surety company became his bail. Caroline Barry, deceased, was an elderly woman residing in Brooklyn, who suffered the loss of all her property by reason of the crimes committed by Marrin for which he was indicted, convicted, and sentenced in New York. The United States filed a demurrer to these petitions, and insists upon its right to forfeit the recognizance, as Marrin failed to appear in accordance with its terms. The precise contention of the government is clearly stated by Judge Dillon in United States v. Van Fossen et al., 28 Fed. Cas. 357, No. 16,607:

"The case stands thus: The United States had the actual custody of the principal to answer an indictment which had already been preferred against

him. Upon the recognizance being taken, the principal was delivered into what Blackstone calls the 'friendly custody' of his sureties instead of being committed to prison. 4 Bl. Comm. 301. They thenceforth became invested with full authority over his person. They are his jailers. They may take him at any time or place—in the state or beyond it. They are aptly said to have the principal always upon the string, and they may pull it when they please, to surrender him in their own discharge. Anonymous, 6 Mod. 231. If they do not exercise their power to prevent his going beyond the jurisdiction, and he does so with or without their consent, and commits an offense and is sentenced to prison for it, this cannot be accepted by the state in whose tribunals the recognizance was taken as a defense thereto."

The petition in that case as subsequently amended suggested that the offense committed was prior to the date of the recognizance, but the court held that that fact did not change the legal obligation of the sureties. The view taken by Judge Dillon in the Van Fossen Case was fully sustained by Justice Swayne in the case of Taylor v. Taintor, 83 U. S. 366, 21 L. Ed. 287. It was there stated that in order to exonerate the bail the performance of the condition thereof must be rendered impossible by the act of God, the act of the obligee, or the act of the law, and it was said that where the principal dies before the day of performance the case is within the first category; where the court before which the principal is bound to appear is abolished without qualification, the case is within the second; if the party be arrested in the state where the obligation is given and sent out of the state by the Governor upon the requisition of the Governor of another state, it is within the third; and it is equally well settled that, if the impossibility be created by the obligor or a stranger, the rights of the obligee will be in no wise affected. The failure to appear was not because of sickness, death, or any other circumstance falling within the first reason, but it is claimed that by both the act of the obligee and the act of the law he was prevented from complying with the conditions of his recognizance. It is contended his failure to appear resulted from the failure of the United States district attorney to urge Judge Chatfield to release him. Upon entering into the recognizance Marrin was delivered into the custody of his surety, who was thereafter responsible for his appearance. Upon this contract the government had a right to rely, and it is not required to go out of the jurisdiction in which the recognizance was given to help the cognizor to extricate himself from a situation in which he of his own motion became entangled. The prosecuting attorney has the right to go before any court, either state or national, and urge the release or removal of a fugitive criminal under bail in his district, if in the judgment of the government it is for the best interests in the administration of the criminal law to do so, and it would depend entirely upon the judgment of the court before which the hearing was had whether or not the party should be released or removed to answer the conditions of his bail and appear when required. The matter of removal is entirely within the discretion of the court, and the most the government or its prosecuting attorney could do in any case would be to make a case which would appeal to that discretion, but whether or not it will make the effort should be left to the judgment of the officers of the government. Though the United States attorney was present at the hear-

ing, his failure to request Marrin's release was no such act of the obligee as to relieve the surety, because non constat that the request would have been granted by the court. It was Marrin's own act in going into that jurisdiction that rendered his appearance impossible. Our attention has not been called to any case holding that under any circumstances the prosecuting attorney of a district in which the recognizance runs is required to make an effort to secure the removal or release of an alleged criminal arrested in another jurisdiction. He may do so, but he is not required to act. The recognizance is taken to secure that very result. Its condition is absolute in this regard, and, in our judgment, it would be a very dangerous innovation to require the government to not only see to it that responsible bail is secured, but, in addition, require it to keep its prosecuting officers in readiness to appear in other and distant jurisdictions to aid the principal in the recognizance to extricate himself from an arrest from which alone the latter is to blame.

If, then, neither the first nor the second reason stated in Taylor v. Taintor can afford any relief, the defense pleaded must rest upon the proposition that his appearance is excused because of the act of the law. Justice Swayne, in Taylor v. Taintor, supra, says:

"There is a distinction between the act of the law proper and the act of the obligor, which exposes him to the control and action of the law."

Marrin and his surety would have been wholly protected had he remained in the Eastern district of Pennsylvania until the time for his appearance in this court. If he had remained within this jurisdiction, he could not have been removed on a warrant of arrest from any other jurisdiction without an order of court. If the court had concluded, as it did in the Beavers Case (C. C.) 131 Fed. 366, that justice demanded his removal, such an order would at the same time relieve his sureties from liability for his appearance. It would be an act of the law, putting it beyond his power to appear in accordance with the condition of his recognizance; but should the court have in its wisdom concluded that it would promote justice to have him held in this district to answer the charge here, his removal could not have been effected; but when he voluntarily went into another district with knowledge of the existence of criminal charges against him there, his arrest was the result of his own act, which "exposed him to the control and action of the law." Marrin was fully aware that the criminal charges in New York against him were still pending, as he had shortly before been arrested here on a warrant from that jurisdiction, and an effort was made to remove him, but this demand was refused by Judge McPherson. At this hearing the United States district attorney appeared and took part in resisting his removal. In spite of this warning that these grave criminal charges against him were still pending, and that the New York authorities were availing themselves of every lawful means of securing his presence in that jurisdiction to answer the charges, he of his own motion went into the jurisdiction where he knew he would be arrested, and now insists that it was not his own act which exposed him to the operation and action of the law there, preventing his appearance, but that the failure of the Unit-

ed States district attorney to extricate him from the situation in which he placed himself was the real cause, which resulted in the refusal of the court to discharge him, and because of this quiescence of the government's representative and the action of the court the principal and his surety are relieved from further liability. At most, the United States district attorney could only have urged Marrin's release in the proceeding before Judge Chatfield, so that when his presence here would be required he could, if he then felt so inclined, appear; but the district attorney could not insist on Marrin's removal at the hearing, as he had given bail' and security for his appearance within five days after the "filing the mandate" of the Court of Appeals, and he was not in default. The distressing poverty into which his victim had been plunged by his alleged forgeries, from a position of comparative affluence, had highly incensed that portion of Brooklyn aware of the circumstances, and Marrin's presence among them, free from arrest and beyond the power of the local authorities to try him for these alleged offenses, would no doubt in their judgment be regarded little less than a crime, so that out of respect for the feelings of the community in which he was arrested, as his removal could not be demanded, the district attorney could scarcely be expected to insist that he be discharged, thereby enabling him to go unmolested abroad in a community in which high crimes were pending against him, in the commission of which he not only offended against the state, but, it is charged, swept away her entire fortune and impoverished Mrs. Barry.

The petition of Walter Westlake, administrator of Caroline Barry, deceased, urges that the bail bond be vacated, and that the American Surety Company be exonerated thereon, and that the United States government and the American Surety Company be directed to institute proceedings to secure the surrender of Marrin—this in order that the counter indemnity deposit of $10,000 placed with the American Surety Company by Marrin may be released and paid over to the petitioner as the administrator of Caroline Barry, deceased, from whom Marrin, it is said, secured it through his forgeries.

It is claimed that the provisions of section 1020, Rev. St. (U. S. Comp. St. 1901, p. 719), places the matter of forfeiture within the discretion of the court when "it appears * * * there has been no willful default of the party, and that a trial can notwithstanding be had in the case, and that public justice does not otherwise require the same penalty to be enforced." Aside from the question as to whether we should encourage the practice of depositing an indemnity with surety on a bail bond by remitting the penalty in order to release the indemnity; it does not appear to this court that there has been no willful default. When it is remembered Marrin left the jurisdiction in which the prosecuting attorney had once taken part in securing his release from arrest on warrants from New York state, and voluntarily went into the latter jurisdiction almost immediately after his release here, it seems that no other conclusion is warranted but that the default on his part was willful and entitles him to no relief now; nor is his surety in any better position, because it not only failed to prevent him from leaving this district, but it was present at the hearing, and, notwithstanding it was "his jailer" and had him in its "friendly cus-

tody," it failed to urge his release, but in fact "disavowed any interest in the matter except its obligation imposed upon it by the bail bond," etc.

It must be conceded that if, under any circumstances, the court would have a right to remit the penalty in order that the indemnity fund could be recovered, and Mrs. Barry herself had presented a petition for that purpose, accompanied with proof of her ownership to the fund deposited, the circumstances of her loss and the fact of her impoverished condition, resulting from the loss of her property through the alleged forgeries, would make a very strong case to move the court to a remission of the penalty; but in this case the claim is made by her heirs, who, while entitled to her property, are by no means entitled to the same consideration in the determination of this question that the decedent would have been entitled to receive. If the surety failed to do what the law required of it at the time of the hearing before Judge Chatfield, the claimants for the fund have their remedy; but it is contended by the government that there is no legal, equitable, or moral ground why the surety should be relieved in order that Mr. Westlake may have an easier method of enforcing his claim against the surety to the indemnity deposited by Marrin, and in this we think the government is right.

The demurrers to the petitions of Frank C. Marrin et al. are sustained, and the motion of the government to forfeit the recognizance is allowed.